UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ENYA KOLKER, *individually and on behalf of all others similar situated*,

Plaintiff,

- against -

BADIA SPICES, INC.,

Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
25-CV-3099 (PKC) (CHK)

PAMELA K. CHEN, United States District Judge:

Plaintiff Enya Kolker brings this putative class action against Defendant Badia Spices, Inc., alleging that Defendant misrepresented two of its spice products as "only the finest quality" when, in fact, the products contained lead. With respect to these two products, Plaintiff alleges claims of (1) deceptive, misleading, and false practices and advertising in violation of New York General Business Law §§ 349 and 350 ("Section 349" or "Section 350"); (2) breach of the express warranty under all fifty state laws; and (3) unjust enrichment. Before the Court is Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). For the reasons stated herein, the Court grants in part and denies in part the Motion.

## BACKGROUND[1]

### I. Factual Background

Defendant "manufactures, markets, advertises, and sells food products," namely spices, including ground ginger ("Ginger Product") and ground cinnamon ("Cinnamon Product") (collectively, the "Products"). (Compl., Dkt. 1, ¶¶ 1, 28.) Defendant advertises its spices on its

[1] The Court assumes the truth of the Complaint's non-conclusory factual allegations. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (citations omitted).

website and social media as "only the finest quality spices" and as "Kosher," "Gluten-Free," "Halal," "Free of Sodium," and "MSG-Free." (*Id.* ¶¶ 6, 8.) The Products' packaging and labeling additionally "lists the ingredients in the Products." (*Id.* ¶ 4.) This packaging makes no mention that "the Products contain, or are at the risk of containing, lead." (*Id.*) In fact, lead is not mentioned "anywhere on the Products' packaging or labeling." (*Id.* ¶¶ 20, 31.)

Plaintiff is a consumer of Defendant's Products. (*See id.* ¶ 60.) "During the applicable statute of limitations period, Plaintiff purchased and used Defendant's Products . . . numerous times" from "brick and mortar stores including Food Universe in [the] Bronx, New York" as well as from "Amazon.com," whereupon she shipped the Products to her home. (*Id.*)

On June 2, 2024, the New York State Department of Agriculture and Markets issued a warning alert (the "Alert") as to the presence of "elevated lead levels in ground ginger and ground cinnamon manufactured" by Defendant and sold "at multiple retailers across New York state." Stephanie Ryan, *Ground ginger and ground cinnamon from Badia Spices may have elevated lead levels*, CBS 6 Albany (June 5, 2025), https://cbs6albany.com/news/local/recall-ground-ginger-and-ground-cinnamon-from-badia-spices-may-have-elevated-lead-levels [https://perma.cc/V9EV-T4EP].[2] This Alert applied to Defendant's Ginger Product, "sold in 1.5-ounce clear plastic bottles with black plastic caps with UPC Code #033844002237 and [l]ot # 307922," as well as to Defendant's Cinnamon Product, "sold in 2-ounce clear plastic bottles with black plastic caps with UPC Code #033844000158 and [l]ot #'s 305481 and 309528." Ryan, *supra*. "The contamination was discovered after analysis by New York State Food Laboratory personnel revealed the product

[2] This document is incorporated into the Complaint by reference. (*See* Compl., Dkt. 1, ¶¶ 14–15 & n.3 (citing Ryan, *supra*)); *Goodman v. Bouzy*, No. 21-CV-10878 (AT) (JLC), 2023 WL 3296203, at *10 n.7 (S.D.N.Y. May 8, 2023) (finding item hyperlinked to a complaint to be incorporated by reference), *report and recommendation adopted*, 2023 WL 4235851 (S.D.N.Y. June 28, 2023).

tested above the 1-part per million action level for lead in spices." *Id.* The Alert advised consumers to discard "these products." *Id*.

At some point, Plaintiff tested the Ginger Product she had purchased. (Compl., Dkt. 1, ¶ 16.) Plaintiff "engaged ECA Laboratory in San Diego, CA" to conduct the testing, which revealed that the Ginger Product "contained 0.973 ppm (973 ppb)[3] of lead." (*Id.*) "FDA guidelines regarding food safety for children call for a maximum of 10 parts per billion (ppb) for fruits, vegetables (excluding single-ingredient root vegetables), mixtures (including grain- and meat-based mixtures), yogurts, custards/puddings, and single-ingredient meats; 20 ppb for single-ingredient root vegetables; and 20 ppb for dry infant cereals." (*Id.* ¶ 17 (citation omitted).) Plaintiff contends that "[t]here is no safe blood level of lead" and that even low levels of lead consumption can cause adverse health effects. (*Id.* ¶¶ 33–36); *see also* Ryan, *supra* ("[E]xposure to lead may cause health problems to consumers, particularly infants, small children, pregnant women and those with underlying kidney disorders."). "[B]ecause they contain[ed] the known harmful neurotoxin, Lead," Plaintiff maintains, "[t]he Products [she] received were worthless." (Compl., Dkt. 1, ¶ 61; *see also id.* ¶¶ 24, 82, 90.)

## II. Procedural History

On June 4, 2025, Plaintiff filed a putative class action complaint against Defendant, alleging, *inter alia*, deceptive and misleading business practices as to the manufacturing, marketing, and sale of Defendant's Products. (Compl., Dkt. 1.) On July 24, 2025, Defendant filed

[3] "Ppm" and "ppb" "are both units used to measure the concentration of a substance in a solution or mixture." *See PPM to PPB Converter*, Inch Calculator, https://www.inchcalculator.com/ppm-to-ppb-converter/ [https://perma.cc/2AFC-JH4U] (last visited Sep. 18, 2026). Ppm is 1 part substance per 1,000,000 parts solution, and ppb is 1 part substance per 1,000,000,000 parts solution. *See id*. Thus, the conversion ratio of ppm to ppb is 1,000 ppm/ppb.

a motion for a pre-motion conference indicating its intent to file a motion to dismiss. (Dkt. 13.) The Court denied Defendant's motion as unnecessary and set a schedule for briefing. (*See* 08/19/2026 Dkt. Order; 08/26/2026 Dkt. Order.) The Motion to Dismiss was fully briefed on November 12, 2025. Since completing briefing, Plaintiff has filed three letters with supplemental authorities, and Defendant has filed three letters in response to each. (*See* Dkts. 23–28.)

**DISCUSSION**

## I. Dismissal for Lack of Standing

### A. Legal Standard

A party may seek to dismiss a case for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject[-]matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it," *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000), such as where a "plaintiff[] lack[s] Article III standing," *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 198 (2d Cir. 2005) ("If plaintiffs lack Article III standing, a court has no subject[-] matter jurisdiction to hear their claim."). To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "The party invoking federal jurisdiction bears the burden of establishing the elements of constitutional standing." *Chien v. Future Fintech Grp. Inc.*, 801 F. App'x 5, 7 (2d Cir. 2020) (summary order).

To show injury, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "'actual or imminent, not "conjectural"

or "hypothetical."'" *Lujan*, 504 U.S. at 560 (citations omitted). At the motion-to-dismiss stage, this burden may be met through "general factual allegations of injury resulting from the defendant['s] conduct," *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 253 n.13 (E.D.N.Y. 2021) (quoting *Lujan*, 504 U.S. at 561), which, at this stage, the Court must accept as true, *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).

**B. Plaintiff Has Demonstrated Standing**

Plaintiff alleges that she "paid more for[] the Products than she would have had she known the truth about the Products" and that the Products "were worthless because they contain the known harmful neurotoxin, Lead." (Compl., Dkt. 1, ¶ 61.) Plaintiff effectively seeks to establish injury through a "price-premium theory." This kind of injury occurs where a plaintiff purchases a product bearing a misleading label and sustains financial injury, such as "paying a premium," as a result. *Axon v. Fla.'s Nat. Growers, Inc.*, 813 F. App'x 701, 703–04 (2d Cir. 2020) (summary order) (citing *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 92 (2d Cir. 2018)); *accord Lurenz v. Coca-Cola Co.*, No. 22-CV-10941 (NSR), 2024 WL 2943834, at *2 (S.D.N.Y. June 10, 2024) (collecting cases). Contrary to Defendant's claims, (*see* Def.'s Mem. Supp. Mot. Dismiss, Dkt. 19-3 ("MTD"), at 12–13), a plaintiff need not identify "comparable, cheaper, or safer products to show that they, in fact, paid a premium," *see In re Hain Celestial Heavy Metals Baby Food Litig.*, No. 21-CV-0678 (NRM) (AYS), 2024 WL 5239510, at *8 (E.D.N.Y. Dec. 27, 2024) (collecting cases rejecting this requirement); *cf. Choudhry v. Mead Johnson & Co.*, No. 25-CV-9480 (ER), 2026 WL 2349932, at *16–17 (S.D.N.Y. Aug. 13, 2026) (finding allegations of a price premium sufficient even though the amount of the premium was not specified). Instead, a plaintiff may establish standing by alleging, *inter alia*, that they "would not have purchased those products or would not have paid as much for them had they known that . . . they contained (or had a material risk of containing) harmful levels of toxic heavy metals." *Cantor v. Beech-Nut Nutrition Co.*, No.

25-821-CV, 2026 WL 304246, at *2 (2d Cir. Feb. 5, 2026) (summary order); *accord White v. Tom's of Me., Inc.*, No. 25-CV-0662 (OEM) (LKE), 2026 WL 686269, at *7 (E.D.N.Y. Mar. 11, 2026). This kind of injury has been "broadly accepted in the Second Circuit." *Bell v. Greenbrier Int'l, Inc.*, No. 24-CV-3559 (JMF), 2024 WL 4893270, at *3 (S.D.N.Y. Nov. 26, 2024) (citation omitted) (finding plaintiff alleged a price premium theory of standing where she claimed that had she been aware of the lead levels in the product, she would not have purchased the product or would have paid less for it).

Even though the price premium theory is available to Plaintiff, she must "plead enough facts to make it plausible that [she] did indeed suffer the sort of injury that would entitle [her] to relief." *Onaka v. Shiseido Ams. Corp.*, No. 21-CV-10665 (PAC), 2023 WL 2663877, at *4 (S.D.N.Y. Mar. 28, 2023) (quoting *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 65 (2d Cir. 2021)). Where, as here, a plaintiff alleges injury due to misrepresentations in a product's branding, marketing, or labeling, a plaintiff must allege facts "demonstrating it is at least plausible that [they] purchased a misbranded product." *Id.* (citing *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732 (2d Cir. 2017) (analyzing whether it was "plausible that [plaintiff] overpaid for at least one product" that was mislabeled)); *Dunning v. Supergoop, LLC*, No. 23-CV-11242 (JPC), 2025 WL 34822, at *4 (S.D.N.Y. Jan. 6, 2025) (determining whether it was plausible "that any [p]laintiff purchased a mislabeled [p]roduct at least once" (citation omitted)). A plaintiff can make this showing in several ways, by alleging: (1) that their "purchased products actually were [among those] misbranded," *i.e.*, that a plaintiff's purchased product contained contaminants; (2) "'that a third-party investigation has revealed defects in the same line of such products' as those [the plaintiff] purchased"; *or* (3) that there is systemic fraud in a market the plaintiff regularly transacts in. *Onaka*, 2023 WL 2663877, at *4–5 (citations omitted) (discussing a plaintiff's testing of

products for PFAS[4]); *accord Walker v. Keurig Dr Pepper Inc.*, No. 22-CV-5557 (MKB), 2024 WL 3432031, at *4 (E.D.N.Y. July 16, 2024); *Franklin v. Gen. Mills, Inc.*, No. 21-CV-1781 (JMA) (AYS), 2025 WL 2614970, at *6 (E.D.N.Y. Sep. 10, 2025); *Esquibel v. Colgate-Palmolive Co.*, No. 23-CV-0742 (LTS), 2025 WL 1785865, at *3 (S.D.N.Y. June 27, 2025).

Here, Plaintiff relies on the first and second methods of establishing injury. She alleges that she hired ECA Laboratory to test the Ginger Product she purchased for lead, (Compl., Dkt. 1, ¶ 16), and that a third-party investigation by the New York State Food Laboratory revealed "elevated lead levels in ground ginger and ground cinnamon manufactured by Badia Spices Inc.," Ryan, *supra*; (*see* Compl., Dkt. 1, ¶¶ 14–15 (citing Ryan, *supra*)). Defendant raises two challenges to Plaintiff's demonstration of standing. First, Defendant asserts that Plaintiff's allegations as to the testing of the Ginger Product she purchased are insufficient, as the Complaint "provides no additional detail about how the lead was tested, when the testing occurred, or how the sample was obtained." (MTD, Dkt. 19-3, at 7–8.) Second, Defendant argues that Plaintiff has failed to sufficiently link the New York State Food Laboratory's test results to the Products Plaintiff purchased and therefore has not plausibly alleged injury. (*Id.* at 8–9.)

Because Plaintiff uses two different methods to establish standing as to the Ginger Product and Cinnamon Product, respectively, the Court addresses Plaintiff's standing as to each Product separately. *See Pellegrino v. Procter & Gamble Co.*, No. 23-CV-10631 (KMK), 2026 WL 880573, at *10 (S.D.N.Y. Mar. 31, 2026) (determining plaintiffs' standing as to two separate products

---

[4] PFAS are "per- and polyfluoroalkyl substances," which "are widely used, long lasting chemicals, components of which break down very slowly over time." *PFAS Explained*, Env't Prot. Agency (Sep. 30, 2025), https://www.epa.gov/pfas/pfas-explained [https://perma.cc/VC7E-FWFU]. "Because of their widespread use and their persistence in the environment, many PFAS are found in the blood of people and animals all over the world and are present at low levels in a variety of food products and in the environment." *Id.*

individually because plaintiffs relied on "two sets of independent test results" for the different products). For the following reasons, the Court concludes that Plaintiff has sufficiently alleged injury as to her purchase of the Ginger Product, but not as to the Cinnamon Product.

1. ECA Laboratory's Testing of Plaintiff's Purchased Ginger Product

"The most direct route" to alleging that a plaintiff purchased a misbranded product is where a plaintiff tests "their own purchases" for contaminants. *Onaka v. Shiseido Ams. Corp.*, No. 21-CV-10665 (PAC), 2024 WL 1177976, at *2 (S.D.N.Y. Mar. 19, 2024). This demonstration of injury is relatively straightforward: a plaintiff merely needs to allege that they purchased a product, tested that product, and the testing revealed the alleged misbranding, such as the presence of a contaminant. *See Esquibel*, 2025 WL 1785865, at *3 (concluding that some plaintiffs "have adequately demonstrated standing by pleading that the November 2023 tests revealed that bottles that they actually purchased were found to contain detectable levels of PFAS"); *Hicks v. L'Oreal U.S.A., Inc.*, No. 22-CV-1989 (JPC), 2024 WL 4252498, at *9 (S.D.N.Y. Sep. 19, 2024) (concluding there was "no dispute" as to standing because a plaintiff alleged that "direct testing of three mascara tubes that [she] actually purchased revealed the presence of PFAS").

Here, Plaintiff has sufficiently alleged injury through her own testing. Plaintiff alleges that "ECA Laboratory in San Diego, CA" tested the "Ginger [P]roduct" she purchased and found that "the Product contained 0.973 ppm (973 ppb) of lead." (Compl, Dkt. 1, ¶ 16.) Plaintiff has provided sufficient facts as to the identity of the testing entity, its location, and its test findings to make it plausible, not merely possible, that she purchased a misbranded item.

Defendant raises two objections to this conclusion, both of which are meritless. First, contrary to Defendant's argument, Plaintiff's failure to allege "how the lead was tested, when the testing occurred, or how the sample was obtained" does not pose a "problem" for standing in this case. (*Contra* MTD, Dkt. 19-3 at 7 (citing *Dunning*, 2025 WL 34822, at *5; *Walker*, 2024 WL

3432031, at *4).) Defendant erroneously relies on the requisite showing for injury when a third-party tests the same product line but not the actual product that the plaintiff purchased. In those cases, the plaintiff usually needs to allege further details about the testing to establish a link between a contaminant in *the tested product* and a contaminant in the product the plaintiff *purchased*. *See, e.g.*, *Dunning*, 2025 WL 34822, at *4 (discussing adequate allegations as to third-party testing where complaint did not allege that plaintiffs tested the actual products they purchased); *Walker*, 2024 WL 3432031, at *4 (same). Several facts may limit the plausibility that the purchased product was misbranded. For example, the testing could have been limited to a small sample, and therefore not indicative of how widespread the contamination was; the testing could have found contaminants in a lot number different from the one the plaintiff bought; or the testing could have been conducted years before or after the plaintiff purchased the product. *See Catalano v. Grimmway Enters.*, No. 7:24-CV-8817 (NSR), 2026 WL 710124, at *3–4 (S.D.N.Y. Mar. 13, 2026) (discussing the widespread nature of contamination in determining whether a plaintiff had standing under a third-party testing theory); *Esquibel*, 2025 WL 1785865, at *4 (discussing the sample size of the products tested, whether the products tested were in the same line of products as the ones the plaintiff purchased, and whether the plaintiff made their purchase near in time to the testing of the products as relevant to standing under a third-party testing theory).

But that requirement does not apply here, because Plaintiff had the actual products that she purchased tested by a laboratory and there are therefore fewer uncertainties as to whether the purchased product was misbranded. Consequently, in this case, Plaintiff need not at this stage "detail how many samples were tested, how many samples were found to be contaminated, and how the testing was conducted." *Pellegrino*, 2026 WL 880573, at *11 (finding standing where plaintiff tested the actual products they had purchased).

Second, the Court is unpersuaded by Defendant's assertion that, because the particulate quantities found by the ECA Laboratory testing fall below any federal or state "action level," Plaintiff cannot show injury. (MTD, Dkt. 19-3, at 8.) New York General Business Law ("GBL") Sections 349 and 350 "are not product standards, but prohibitions of misrepresentations, deceptions and misleading conduct." *Steele v. Wegmans Food Mkts., Inc.*, 472 F. Supp. 3d 47, 50 (S.D.N.Y. 2020). A state's action level is therefore not dispositive of whether a plaintiff has sufficiently alleged injury due to deceptive business practices. *See id.* (dismissing "the extensive discussion and argument in the motion papers . . . [regarding] federal standards for ice cream flavor descriptions [as] without consequence"). "Rather, [here], the question is whether a consumer could reasonably conclude that the Product contains *only* [the finest quality spices] and therefore no lead." *See Sitt v. Nature's Bounty, Inc.*, No.15-CV-4199 (MKB), 2016 WL 5372794, at *12 (E.D.N.Y. Sep. 26, 2016) (rejecting a similar argument and finding that "[d]efendants' purported compliance with FDA rules regarding lead does 'not eliminate the possibility that reasonable consumers may be misled'").

Plaintiff has thus established standing as to the Ginger Product.

2. Third-Party Testing of the Cinnamon Product

Plaintiff, however, has not sufficiently alleged standing as to the Cinnamon Product, which Plaintiff did not personally test. As noted, when it is not possible to test a purchased product, a plaintiff may rely on the results of third-party testing "of the same product line to the product actually purchased." *Dunning*, 2025 WL 34822, at *5 (quoting *Hicks*, 2024 WL 4252498, at *9); *accord Onaka*, 2023 WL 2663877, at *4. "Courts look to a variety of factors to determine whether a meaningful link exists between the results of testing and a plaintiff's actual purchases to permit such a plausible inference." *Dunning*, 2025 WL 34822, at *5. First is temporal proximity; "any testing must have occurred reasonably near in time to the plaintiffs' purchases." *Id.* (quoting *Hicks,*

2024 WL 4252498, at *10). Second, "[t]he pleading also should disclose the number of samples tested, and the testing should involve more than a small number." *Id.* (quoting same). Third, courts have also considered "the geographic proximity of the testing to the plaintiff's purchases." *Id.* (quoting same). Finally, courts look to "whether plaintiffs provide information about the entity performing the test, such as [the] entity's name and testing methodology." *Pellegrino*, 2026 WL 880573, at *9 (collecting cases).

Here, in alleging injury as to the Cinnamon Product based on third-party testing, Plaintiff relies entirely on a news article incorporated by reference into her Complaint. (*See* Compl., Dkt. 1, ¶ 15 n.3); *see supra* n.2. That news article, written on June 2, 2024, noted that the New York State Department of Agriculture and Markets Commissioner warned consumers about the presence of elevated levels of lead in Defendant's Cinnamon Product in lot numbers 305481 and 309528.[5] Ryan, *supra*. The article further reported that "[t]he contamination was discovered after analysis by New York State Food Laboratory personnel revealed the product tested above the 1-part per million action level for lead in spices." *Id.*

These allegations fall well short of alleging a meaningful link between the results of third-party testing and Plaintiff's actual purchase of Defendant's Cinnamon Product. Plaintiff does not allege how many samples the New York State Food Laboratory tested, the geographic proximity of the products tested, whether the lot numbers at issue represented a large portion of Defendant's Products for sale in New York, or other facts indicating how pervasive the contamination was. *See, e.g.*, *Brown v. Coty, Inc.*, No. 22-CV-2696 (AT), 2024 WL 894965, at *4 (S.D.N.Y. Mar. 1, 2024) (declining to find standing in part because the complaint did not allege the number of

---

[5] Although the article also reported on the lab results for Defendant's Ginger Product, the Court focuses only on the results related to Defendant's Cinnamon Product, since Plaintiff need not rely on third-party testing to establish injury as to the Ginger Product.

products tested in third-party study and whether all or only some products tested positive); *Pellegrino*, 2026 WL 880573, at *11 (finding allegations as to testing insufficient in part because complaint did "not include the number of samples tested nor information regarding how pervasive the lead contamination was found to be").

Nor does Plaintiff allege temporality, as neither the Complaint nor the news article states when the testing by the New York State Food Laboratory occurred, or when the tested samples were collected.[6] *See Soto v. GNC Holdings, LLC*, No. 24-CV-3613 (JBG), 2025 WL 662135, at *3 (N.D. Ill. Feb. 28, 2025) (finding a plaintiff lacked standing in part because she did not state when the testing occurred, "leaving the reader to speculate about whether days, months, or years intervened between the testing and [plaintiff's] purchases"). And although Plaintiff states that she purchased products from a variety of sources in New York, (Compl., Dkt. 1, ¶ 60), this allegation cannot salvage her standing, because she does not state *when* she purchased the disputed spices and, in particular, the Cinnamon Product. Plaintiff only alleges that she purchased and used Defendant's Products "numerous times" "[d]uring the applicable statute of limitations period[,]" (*id.*), *i.e.*, during the three years prior to June 2025 when she filed her Complaint.[7] (*Id.*) But these purchases could have all been made within the first few weeks of that period, which could mean that there was a year or more gap between her purchases of the Cinnamon Product and the New York State Food Laboratory testing. The likelihood that Plaintiff purchased a contaminated product is thus significantly less than in cases where the plaintiffs purchased products on a weekly or regular basis. *Compare Levy v. Hu Prods. LLC*, No. 23-CV-1381 (AT), 2024 WL 897495, at

[6] The article only states when the Alert was issued. *See* Ryan, *supra*.

[7] The statute of limitations for Section 349 and Section 350 claims is three years. *Nachman v. Tesla, Inc.*, No. 22-CV-5976 (RPK) (ST), 2023 WL 6385772, at *3 (E.D.N.Y. Sep. 30, 2023), *aff'd*, No. 24-2362, 2025 WL 1201996 (2d Cir. Apr. 25, 2025).

*3–5 (S.D.N.Y. Mar. 1, 2024) (finding allegations of temporality sufficient where plaintiff alleged weekly purchases of defendants' product), *and John*, 858 F.3d at 737 (same, where plaintiff alleged "regular[ ]" purchases), *with Onaka*, 2024 WL 1177976, at *3–4 (finding plaintiffs failed to connect third-party study to product purchased in part because "[p]laintiffs have made no allegations regarding the frequency of their purchases," instead only alleging that they "previously purchased" the products and had most recently purchased them at least a year after the products were tested in the third-party study).[8]

Put simply, all Plaintiff has alleged is that, at some point, the New York State Food Laboratory found lead in some lots of Defendant's Products and that Plaintiff purchased Defendant's Products, including the Cinnamon Product, "numerous times" during a three-year period. These allegations are simply too speculative to plausibly infer that the Cinnamon Product that Plaintiff purchased likely contained lead.

Perhaps in recognition of these deficiencies, Plaintiff relies on *Winans v. Ornua Foods North America Inc.*, 731 F. Supp. 3d 422, 428 (E.D.N.Y. 2024), for the proposition that the Alert's existence obviates any testing requirement. (*See* Mem. Opp'n MTD ("Opp'n"), Dkt. 20, at 8.) But *Winans* is materially distinguishable. Although the district court in *Winans* rejected a rule that

[8] Plaintiff points to *Franklin*, 2025 WL 2614970, at *7, as supporting the notion that purchasing products "multiple times" during the appliable period sufficiently alleges injury in fact. (Mem. Opp'n MTD, Dkt. 20, at 10.) But that case is distinguishable because *Franklin* relied on facts suggesting that the contamination of the disputed product was more widespread, namely the defendants' admission that the alleged contaminant, "ortho-phthalates[,] . . . may be present in the packaging materials and food processing equipment that produces the cheese and cheese powder [its] our macaroni and cheese." *Franklin*, 2025 WL 2614970, at *3, *7 ("Given [d]efendants' admissions of the presence and/or risk of phthalates in the Products on the FAQ section of their website after the 2017 Coalition Study had found that macaroni and cheese powder had the highest level of phthalates of all of the cheese products tested and that all ten varieties of the macaroni and cheese products tested contained phthalates, it is plausible that [p]laintiff Franklin purchased Cheese Packet Products that contained phthalates."). Plaintiff does not allege similar facts sufficient to establish injury caused by her purchase and use of Defendant's Cinnamon Product.

"would require plaintiffs to provide laboratory testing results of the product to satisfy standing," 731 F. Supp. 3d at 428, in that case, the defendant had publicly issued a recall of the products at issue and the plaintiff had "purchased and consumed the Products subject to recall," *id.* at 427–28. It was in that context that the district court found laboratory testing unnecessary to show injury; by recalling the product, the defendants had conceded the likelihood of contamination. Even if the Court interprets *Winans*, as Plaintiff argues, to stand for the proposition that "recall of a product, in and of itself, is a plausible indication of widespread contamination that gives rise to standing for a plaintiff that purchased a product subject to that recall," (Opp'n, Dkt. 20, at 8)—which the Court does not—Plaintiff would not be able to demonstrate standing. Unlike in *Winans*, Plaintiff does *not* allege that she purchased a Cinnamon Product with the specific lot number subject to the Alert. (*See generally* Compl., Dkt. 1.) Nor does Plaintiff offer any suggestion that, like the recall in *Winans*, the Alert here was widespread. *See Soto*, 2025 WL 662135, at *3 (distinguishing *Winans* because the alleged defect was not alleged to be sufficiently widespread); *see also Bell*, 2024 WL 4893270, at *3 (explaining that specific lots identified in an FDA alert as containing lead "d[id] not even establish that all or most [of the product] manufactured during a particular time contained elevated lead levels").

As it stands, Plaintiff has alleged merely a *risk* that she purchased a contaminated product. But "mere risk that [a] [p]roduct was contaminated with an injurious substance[] . . . does not establish an economic injury." *Esquibel*, 2023 WL 7412169, at *3; *Brown*, 2024 WL 894965, at *4 (same). Accordingly, the Court finds that Plaintiff has failed to sufficiently allege injury as to the Cinnamon Product and thus lacks standing to bring any claims related to that Product.

## II. Dismissal for Failure to State a Claim

Because the Court finds that Plaintiff lacks standing to bring any claims related to Defendant's Cinnamon Product, it only considers Defendant's Motion to Dismiss with respect to Plaintiff's Ginger Product claims.

### A. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face where it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In reviewing a complaint for failure to state a claim, the Court accepts as true all factual allegations and draws from them all reasonable inferences, while disregarding "conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester County*, 3 F.4th 86, 91 (2d Cir. 2021) (quoting *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020)).

### B. New York General Business Law § 349 or § 350

"To successfully assert a claim under either [Section 349 or 350], a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Henry v. Nissin Foods (U.S.A.) Co.*, No. 22-CV-0363 (NGG) (RER), 2023 WL 2562214, at *3 (E.D.N.Y. Mar. 17, 2023) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)); *see also Krasnyi Oktyabr, Inc. v. Trilini Imps.*, No. 05-CV-5359 (DGT) (RER), 2007 WL 1017620, at *12 (E.D.N.Y. Mar. 30, 2007) ("The standards for deceptive business practices under [S]ection 349 of the General Business Law are substantively identical to those for false advertising under

[S]ection 350." (citing *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002))). Defendant challenges Plaintiff's showing as to the second and third elements of these claims. For the following reasons, the Court finds that Plaintiff has plausibly alleged Defendant's conduct was materially misleading and that such conduct caused injury.

1. Plaintiff Has Alleged a Materially Misleading Practice

A practice is misleading where it would be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995); *accord Heskiaoff v. Sling Media, Inc.*, 719 F. App'x 28, 31 (2d Cir. 2017) (summary order).[9] And to be material, the deception must "pertain[] to an issue that may bear on a consumer's decision to participate in a particular transaction." *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 102 (2d Dep't 2012); *see also McCracken v. Verisma Sys., Inc.*, 91 F.4th 600, 608 (2d Cir. 2024) (explaining that, to be material, the statement must have caused the consumer "to make a different initial choice" (citing *N. State Autobahn*, 953 N.Y.S.2d at 102)). To determine whether a statement is actionable, "[c]ourts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole." *Troncoso v. TGI Friday's Inc.*, No. 19-CV-2735 (KPF), 2020 WL 3051020, at *6 (S.D.N.Y. June 8, 2020) (quoting *Belfiore v. Procter & Gamble, Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015)); *accord Ackerman v. Coca-Cola Co.*, No. 09-CV-0395 (JG), 2010 WL 2925955, at *15 (E.D.N.Y. July 21, 2010); *see also Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014) (considering a website and Facebook page "in tandem with the

[9] Some district courts have alternatively stated this standard as requiring plaintiffs to "plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled." *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (quoting *Sarr v. BEF Foods, Inc.*, No. 18-CV-6409 (ARR) (RLM), 2020 WL 729883, at *3 (E.D.N.Y. Feb. 13, 2020)).

product labels" to determine whether a reasonable consumer could be misled). On a motion to dismiss, the relevant inquiry is whether, as a matter of law, "no reasonable consumer could be misled." *Eidelman v. Sun Prods. Corp.*, No. 16-CV-3914 (NSR), 2017 WL 4277187, at *4 (S.D.N.Y. Sep. 25, 2017).

Plaintiff asserts that Defendant's advertising and labeling of the Ginger Product as containing "only the finest quality spices" and as "Kosher," "Gluten-Free," "Halal," "Free of Sodium," and "MSG-Free," (Compl., Dkt. 1, ¶¶ 6, 8), are materially misleading because these phrases "would be interpreted by any reasonable consumer as a guarantee that the Products are safe to be consumed" and do not "contain substances that are harmful such as lead," (*id.* ¶¶ 7, 9). Moreover, Plaintiff contends that these representations are misleading because they "omit[] and [do] not disclos[e] to consumers . . . that the Products are contaminated with unsafe levels of lead." (*Id.* ¶ 2, *see also id.* ¶ 31 (explaining that these omissions "lead reasonable consumers to believe the Products do not contain, and are not at risk of containing, lead").)[10]

Plaintiff's allegations are sufficient to allege that a reasonable consumer could be misled into purchasing or overpaying for the Ginger Product because they believe that the Product does

[10] New York law requires that a plaintiff pleading an omission to additionally allege that the "plaintiff[] could not 'reasonably have obtained the relevant information they now claim the defendant failed to provide.'" *Paradowski v. Champion Petfoods USA, Inc.*, No. 22-962-CV, 2023 WL 3829559, at *2 (2d Cir. June 6, 2023) (summary order) (quoting *Oswego*, 647 N.E.2d at 745). Plaintiff alleges that "[c]onsumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as lead, especially at the point of sale, and therefore must and do rely on Defendant to truthfully and honestly report what the Products contain or are at risk of containing on the Products' packaging or labels." (Compl., Dkt. 1, ¶ 30.) Plaintiff's allegation is sufficient to meet this additional pleading requirement. *See In re Lindt & Sprungli (USA), Inc., Dark Chocolate Litig.*, No. 23-CV-1186 (AMD) (JAM), 2024 WL 4107244, at *6–7 (E.D.N.Y. Sep. 6, 2024) (finding allegation that "[c]onsumers lack the scientific knowledge necessary to determine whether [d]efendant's Products do in fact contain Heavy Metals, or to ascertain the true nature of the ingredients and quality of the Products" to sufficiently allege that the consumer could not have reasonably obtained the information defendant failed to provide (first alteration in original)).

not contain any lead, and is not at risk of containing lead. The exclusionary language in Defendant's advertising—that the Product contains "*only* the finest quality spices," (*id.* ¶ 6 (emphasis added))—suggests the omission of ingredients that are not spices or not high quality, such as lead. Several courts in this Circuit have found similar representations could plausibly mislead a reasonable consumer to conclude that a product did not contain lead. *See In re Lindt*, 2024 WL 4107244, at *5–6 (finding allegations that chocolate products are crafted with the "finest ingredients" could mislead a consumer to purchase the product "because the consumer believed that the bars did not contain unsafe amounts of lead, or any lead at all"); *Sitt*, 2016 WL 5372794, at *2, *11–13 (concluding that labeling of product as using only the "finest quality herbs and spices" and "natural whole herb" could mislead a consumer into believing that "the Product contains *only* herbs and spices and therefore no lead"); *see also Scholder v. Sioux Honey Ass'n Coop.*, No. 16-CV-5369 (GRB), 2022 WL 125742, at *4 (E.D.N.Y. Jan. 13, 2022) (concluding that "a reasonable consumer could be misled into believing a product labeled '100% Pure Unfiltered Honey' contained no contaminants").

The message conveyed by this exclusionary language is reinforced by Defendant's descriptions of the Products as "Kosher," "Gluten-Free," "Halal," "Free of Sodium," and "MSG-Free," (Compl., Dkt. 1, ¶ 8). Although not literally false, these descriptors could still be actionable misrepresentations because they bear relationships to healthy, quality, and carefully-examined ingredients, and thus imply that Defendant is "concerned with—and diligent about—removing unwanted ingredients and contaminants from the Products." *Levy*, 2024 WL 897495, at *7; *see also Ripa v. Unilever U.S. Inc.*, No. 25-CV-10028 (CM), 2026 WL 811180, at *8 (S.D.N.Y. Mar. 23, 2026) ("[A] statement need not be literally false to be prohibited by GBL Sections 349 and 350. A reference to an ingredient can convey an implicit message even in the absence of an express

promise." (citation omitted)). A reasonable consumer could believe, based on these statements, that the spices do not contain unsafe amounts of lead, or any lead at all. *See Levy*, 2024 WL 897496, at *6–7 (reaching a similar conclusion based on "'the long list of undesired items that the [p]roduct boastfully d[id] not contain,' including refined sugar, dairy, and soy"); *In re Hain*, 2024 WL 5239510, at *10–12 (determining that terms such as "Non-GMO," "Free of GMOs," and "No Genetically Engineered Ingredients[,]" "Free of Preservatives[,]" "Free of Pesticides or Herbicides," and "made with superior ingredients" could lead a reasonable consumer to interpret the label to specify "the absence of dangerous amounts of heavy metals" (citations omitted)); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413 (RRM) (RLM), 2013 WL 4647512, at *13–16 (E.D.N.Y. Aug. 29, 2013) (determining a reasonable consumer could view a label touting a product as "All Natural" and "NO MSG—No Preservatives—No Artificial Flavors" as excluding GMOs).[11]

The Court disagrees with Defendant's attempt to dismiss the "only the finest quality spices" statement as nonactionable puffery, (MTD, Dkt. 19-3, at 17). Puffery is subjective opinion, *see*

[11] The Court is not persuaded otherwise by the cases that Defendant cites. (*See* MTD, Dkt. 19-3, at 16–17 (citing *Franklin*, 2025 WL 2614970, at *7, *9; *Kennedy v. Mondelez Glob. LLC*, No. 19-CV-0302 (ENV) (SJB), 2020 WL 4006197; *Sarr*, 2020 WL 729883, at *4).) Unlike the defendants in *Franklin* and *Kennedy*, Defendant represents that the products contain *only* the finest quality spices. *See Franklin*, 2025 WL 2614970, at *9–10 (finding nonactionable a statement that defendant's product had "[o]rganic cheese from cows raised without antibiotics or synthetic hormones" because it did not suggest that the product did not contain phthalates and the label did not state "that the [p]roducts [we]re *completely* free from harmful chemicals" (emphasis added)); *Kennedy*, 2020 WL 4006197, at *12 (finding packaging of product labeled as "made with real honey" and containing "no high fructose corn syrup" to not be misleading as to the presence of artificial sweetener because the label statements were "factually true" and because the products did not state that honey is the "only ingredient," unmixed with artificial sweeteners). Meanwhile, *Sarr* is distinguishable because, unlike in that case, Plaintiff's allegations do not concern the existence of an ingredient that was disclosed but merely de-emphasized. *See Sarr*, 2020 WL 729883, at *4–5 (concluding that packaging, which stated that mashed potatoes were made with real butter, was not misleading as to the presence of vegetable oil because the potatoes did, in fact, contain real butter and elsewhere disclosed the existence of vegetable oil in the ingredient list).

*Lin v. Can. Goose US, Inc.*, 640 F. Supp. 3d 349, 359 (S.D.N.Y. 2022) (collecting cases), or an "exaggeration or overstatement expressed in broad, vague, and commendatory language," *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK), 2016 WL 4367991, at *16 (S.D.N.Y. Aug. 12, 2016) (citation omitted); *Elkind v. Revlon Consumer Prods. Corp.*, No. 14-CV-2484 (JS) (AKT), 2015 WL 2344134, at *13 (E.D.N.Y. May 14, 2015) ("[V]ague statements of a product's superiority are nonactionable puffery." (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007))). Although vague terms such as "highest quality," without more, may amount to an inactionable opinion, *see Lin*, 640 F. Supp. 3d at 359 (finding "the highest quality Canadian down available" to be inactionable puffery), here, Defendant advertises that the product contained *only* the finest quality spices. This addition of "only," as noted above, turns a potentially subjective and vague statement into a measurable and concrete declaration of all of the product's contents. *See Sitt*, 2016 WL 5372794, at *11 n.12 (rejecting arguments that statements were mere puffery for similar reasons). Moreover, when considered in the context of the litany of ingredients Defendant claims the Product does *not* contain, "highest quality" takes on the character of a health and quality assurance. *See supra*.

The Court also finds unpersuasive Defendant's argument that its representations are not material because "Plaintiff fails to identify a single pertinent federal or state regulatory limit that the Products allegedly exceed," (*see* MTD, Dkt. 19-3, at 14). Defendant charges that "[a]bsent any allegation that lead levels in the Products exceed some relevant benchmark," "the court cannot infer that its alleged presence would be material to reasonable consumers." (*Id.* at 15, 18–19 (emphasis omitted).) Not so. Plaintiff sufficiently alleges that consumers seek products "safe and free from harmful known substances, including lead." (*See* Compl., Dkt. 1, ¶¶ 11, 46.) State and federal benchmarks are of no consequence with respect to safety, Plaintiff alleges, because there

is *no* safe level of lead in blood, and even small amounts of lead consumption "has been shown to reduce intelligence, and to increase the risk of mental illness, dementia, hypertension, arrhythmia, and breast cancer," (*see id.* ¶ 10; Opp'n, Dkt. 20, at 17). In other words, Plaintiff alleges that Defendant's failure to disclose the presence of lead in the Ginger Product, or its misleading suggestion that there is no lead in the Product, would be material to a reasonable consumer. *See Levy*, 2024 WL 897495, at *6 (finding plaintiff alleged materiality, despite argument that lead levels in the products at issue fell below FDA levels, because plaintiff alleged that no amount of lead is safe and that lead content was important to consumers); *cf. Pellegrino*, 2026 WL 880573, at *12 (rejecting argument that plaintiffs must allege that the amounts of lead in the products are dangerous, because plaintiffs alleged that there was no safe level of exposure to lead without adverse consequences and that there was no known safe blood level concentration of lead). Moreover, Plaintiff *does* allege that the level of lead found in the Ginger Product tested by ECA Laboratory exceeds the FDA guidelines regarding food safety for processed food for babies. (Compl., Dkt. 1, ¶ 17.) Whether these standards are comparable[12] and whether the level of lead in the Ginger Product is "safe" is a question of fact ill-suited to resolution on a motion to dismiss, where the Court must construe all inferences in Plaintiff's favor. *See In re Lindt*, 2024 WL 4107244, at *7 (reaching a similar conclusion).[13]

[12] (*See, e.g.*, Reply Supp. MTD, Dkt. 21, at 5 (contending that Plaintiff's allegations as to the safe level of lead in baby food "has no purchase" as to spices); MTD, Dkt. 19-3, at 1, 8 (noting that the ECA Laboratory test results revealed levels of lead below New York's 1 ppm action level).) The Court declines to take judicial notice of the articles that Defendant cites to in further support of this argument, as the Court cannot assume the truth of the contents therein, *see, e.g.*, *Tenemille v. Town of Ramapo*, No. 18-CV-0724 (KMK), 2020 WL 5731964, at *10 (S.D.N.Y. Sep. 24, 2020).

[13] The Court acknowledges that other courts have required plaintiffs to allege a particular level of lead that is associated with harm to establish materiality in cases involving heavy metals

Finally, to the extent that Defendant suggests that the widespread presence of lead in the environment renders its representations—that the Ginger Product has only the finest quality spices—not misleading, (*see* MTD, Dkt. 19-3, at 17–18), this argument has been repeatedly rejected by courts in this Circuit. *See, e.g.*, *Winans*, 731 F.Supp.3d at 428–29 (acknowledging that PFAS are widespread contaminants but nonetheless finding it plausible that a consumer could read "pure" on a product and conclude that the product was free of other substances, including PFAS); *Hernandez v. Wonderful Co. LLC*, No. 23-CV-1242 (ER), 2024 WL 4882180, at *1–2, *7–8 (S.D.N.Y. Nov. 25, 2024) (declining to find that no reasonable consumer could believe that the product at issue did not contain PFAS, despite its ubiquity, in light of representations that the product was "All Natural" and had "100% POMEGRANATE JUICE").

Nor would the pervasive presence of lead in the environment preclude a consumer from being influenced by its presence or risk of its presence in deciding whether to purchase the Ginger Product and/or how much to pay for it. *Compare* (MTD, Dkt. 19-3, at 18–19 (arguing that "[g]iven the pervasiveness of . . . lead in the food supply," Plaintiff cannot allege that the presence of lead would be material)), *with In re Lindt*, 2024 WL 4107244, at *5 (finding defendant's representations material, despite the fact that lead was "unavoidable in the food supply," because plaintiffs alleged that, had the existence of or risk of lead in the product been disclosed, "the plaintiffs would not have purchased the chocolate bars or they would have paid less for them"), *and Choudhry*, 2026 WL 2349932, at *15 (rejecting argument that presence of heavy metals "in nearly all foods" made its presence in defendant's product immaterial to a consumer). The Court may not draw such adverse inferences on a motion to dismiss, particularly where, as here, Plaintiff alleges that

---

in products, *see, e.g.*, *In re Hain*, 2024 WL 5239510, at *12–13, and respectfully disagrees with those decisions for the reasons stated above.

consumers "would not purchase a product with a harmful neurotoxin such as lead" or, at a minimum, "would have paid less for them," (Compl., Dkt. 1, ¶¶ 49, 56).

2. Plaintiff Has Alleged Causation

Defendant next asserts that Plaintiff has not alleged that she was injured by Defendant's statements on its social media and website because she "does not allege she saw any of the content . . . prior to purchasing the Products." (MTD, Dkt. 19-3, at 19.) Defendant conflates causation and injury. Injury, as stated previously, includes paying a premium for a product. *See, e.g.*, *Singleton v. Fifth Generation, Inc.*, No. 5:15-CV-0474 (BKS) (TWD), 2016 WL 406295, at *10–11 (N.D.N.Y. Jan. 12, 2016) (discussing price premium as a form of injury under Section 349). By comparison, to allege causation for "claims involving consumable goods, ' . . . a plaintiff must [allege] . . . that he has seen the misleading statements of which he complains before he came into possession of the products he purchased.'" *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826 (MKB), 2015 WL 5579872, at *22 (E.D.N.Y. Sep. 22, 2015) (quoting *Goldemberg*, 8 F. Supp. 3d at 480); *accord Steele-Warrick v. Microgenics Corp.*, 677 F. Supp. 3d 107, 116 (E.D.N.Y. 2023).

To the extent Defendant challenges the sufficiency of Plaintiff's *causation* allegations, she has alleged sufficient facts to survive dismissal. Plaintiff alleges that she "and Class Members *read* . . . Defendant's representations about [both the Ginger and Cinnamon Products] and purchased Defendant's Products based thereon." (Compl., Dkt. 1, ¶ 56 (emphasis added).) Courts in this Circuit have repeatedly found this kind of language to sufficiently plead causation. *See Stoltz*, 2015 WL 5579872, at *22 (finding plaintiffs alleged causation by stating that they read the representations and purchased the product as a result); *Duchnik v. Tops Mkts., LLC*, No. 22-CV-0399 (JLS) (HKS), 2023 WL 4827951, at *7 (W.D.N.Y. July 6, 2023) ("[Plaintiff's] allegations that she viewed the label's representation of '210 CUPS' and relied on that representation are at

least sufficient for the Court to infer a causal connection."), *report and recommendation adopted*, 2023 WL 4828141 (W.D.N.Y. July 26, 2023); *Wise v. Combe Inc.*, 724 F. Supp. 3d 225, 237 (S.D.N.Y. 2024) (determining allegation that plaintiffs "saw the challenged representations on the physical Products 'prior to and at the time of purchase'" sufficed to plead causation (citation omitted)); *see Choudhry*, 2026 WL 2349932, at *10 (determining that plaintiffs had sufficiently alleged causation where complaint stated that plaintiffs "read and relied upon the packaging of the Infant Formulas when making their purchasing decisions" (citation omitted)).

### C. Breach of Express Warranty

Defendant's Motion to Dismiss Plaintiff's breach of express warranty claim is granted because Plaintiff has failed to allege notice. To assert a breach of warranty claim under New York law,[14] a buyer must, *inter alia*, "provide the seller with timely notice of the alleged breach of warranty." *See Barton v. Pret A Manger (USA) Ltd.*, 535 F. Supp. 3d 225, 245 (S.D.N.Y. 2021) (citations omitted). Failure to allege pre-suit notice is fatal to a breach of warranty claim. *See, e.g.*, *Bassaw v. United Indus. Corp.*, 482 F. Supp. 3d 80, 87 (S.D.N.Y. 2020) (dismissing express warranty claim where notice was given three years after purchase); *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 144 (E.D.N.Y. 2018) (dismissing express warranty claim where notice was never given); *Tomasino v. Estee Lauder Cos. Inc.*, 44 F. Supp. 3d 251, 260–62 (E.D.N.Y. 2014) (dismissing express warranty claim where notice was not given prior to motion to dismiss briefing).[15] Nowhere in the Complaint does Plaintiff state—or even suggest—that she notified

---

[14] Plaintiff, on behalf of the putative class, asserts that Defendant breached the state warranty laws of every state in the country. (Compl., Dkt. 1, ¶ 105.) But Plaintiff does not contest Defendant's application of New York law to her breach of warranty claim.

[15] "Although a minority of New York State cases suggest an exception to the notice requirement in retail sales," the Court declines to adopt such an exception here, as that exception appears to apply only "where a party alleges physical, in addition to economic, injury." *Colella*, 348 F. Supp. 3d at 144 (compiling cases). Plaintiff does not allege physical injury suffered from

Defendant upon discovering the alleged warranty breach. Allegations that Defendant "knew or should have known" about the presence of lead in the Products, (Compl., Dkt. 1, ¶ 104; Opp'n, Dkt. 20, at 24), do not absolve Plaintiff of her duty to notify Defendant of the alleged breach. Accordingly, the Court finds Plaintiff has failed to state a claim for breach of warranty.

**D. Unjust Enrichment**

The Court also dismisses Plaintiff's unjust enrichment claim. To prevail on a claim for unjust enrichment in New York,[16] a plaintiff must establish "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Nordwind v. Rowland*, 584 F.3d 420, 434 (2d Cir. 2009) (quoting *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006)). An unjust enrichment claim may be premised on deceptive conduct. *See Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 149 (1st Dep't 2004) (reversing dismissal of an unjust enrichment claim premised on deception). However, "unjust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012); *accord Stoltz*, 2015 WL 5579872, at *27. The claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff," and not where "it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello*, 18 N.Y.3d at 790.

Plaintiff's unjust enrichment claim must be dismissed because it is duplicative of her Section 349 and 350 claims. "An unjust enrichment claim is duplicative if it 'relies on the same

---

consuming the products, so this "exception—if it exists at all—would not apply here." *Bassaw*, 482 F. Supp. 3d at 86 n.3.

[16] Plaintiff does not appear to contest the application of New York law to her unjust enrichment claim. *See supra* n.14.

conduct that forms the basis of [the plaintiff's] other claims.'" *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 44 (S.D.N.Y. 2023) (alteration in original) (quoting *Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454, 467 (S.D.N.Y. 2019)). Although Plaintiff claims that her unjust enrichment claim is plead in the alternative, (Opp'n, Dkt. 20, at 24–25), even so, "claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action," *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017) (citations omitted); *Choudhry*, 2026 WL 2349932, at *20 (dismissing unjust enrichment clam on this basis); *see also Bermudez*, 667 F. Supp. 3d at 46 ("Courts regularly dismiss unjust enrichment claims brought as an alternative theory when the claims rely on a similar set of facts as the plaintiff's other claims.").

The fact that unjust enrichment has different elements from Section 349 and 350 claims does not render Plaintiff's unjust enrichment claim non-duplicative. (*Contra* Opp'n, Dkt. 20, at 24–25.) The relevant inquiry as to impermissible duplication is not a comparison of the legal elements; it is whether "the *factual allegations* supporting each claim are the same." *Greene v. Clean Rite Ctrs., LLC*, 714 F. Supp. 3d 134, 151 (E.D.N.Y. 2024) (citation omitted). That is the case here, where the core facts for both Plaintiff's unjust enrichment and Section 349 and 350 claims are the same: that Defendant manufactures, advertises, markets, and sells the Products "while misrepresenting and omitting material facts" and charges a price premium for those Products. (*Compare* Compl., Dkt. 1, ¶¶ 107–13 (making these allegations as to unjust enrichment claim), *with id.* ¶¶ 79, 82, 89, 94 (making the same allegations of conduct as to Sections 349 and 350).) The Court therefore dismisses Plaintiff's unjust enrichment claim. *See Barton*, 535 F. Supp. 3d at 249 (dismissing as duplicative unjust enrichment claim that relied on same allegations as

other claims—that plaintiff was charged a premium for products that misrepresented they were "natural"); *Sitt*, 2016 WL 5372794, at *18 (compiling cases reaching the same conclusion).

**III. Leave to Amend**

Seemingly recognizing the deficits in some of her claims, Plaintiff requests an "opportunity to amend the Complaint." (Opp'n, Dkt. 20, at 24 n.13 (requesting this relief "[t]o the extent the Court determines that additional details regarding the notice Defendant received regarding its breach of warranty are required, or that further allegations are required to plead any of Plaintiffs claims").) Although leave to amend shall be given freely, *see* Fed. R. Civ. P. 15(a)(2), "a district court has the discretion to deny leave to amend where there is no indication from a liberal reading of the complaint . . . that a valid claim might be stated," *Saunders v. Queensborough Cmty. Coll.*, No. 13-CV-5617 (PKC) (RML), 2015 WL 5655719, at *10 (E.D.N.Y. Sep. 24, 2015) (alteration in original) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). Here, the Complaint gives no indication that Plaintiff will be able to surpass the obstacles pertaining to: (1) her standing as to the Cinnamon Product; (2) notice to Defendant of the alleged breach of warranty; and (3) the duplicative nature of her unjust enforcement claims.

Out of an abundance of caution, however, the Court allows Plaintiff to seek leave to amend the Complaint *solely* with respect to her standing, in light of her assertion in her opposition brief (but not in her Complaint) that she did, in fact, purchase "a [C]innamon Product with the specific lot number that the New York State Department of Agriculture and Markets found contained lead," (Opp'n, Dkt. 20, at 8). Should Plaintiff seek leave to amend, she shall file her request with a proposed Amended Complaint, which contains only the Section 349 and 350 claims, supported by additional and more specific factual allegations to rectify the aforementioned deficiencies regarding the Cinnamon Product, no later than forty-five (45) days from the date of this Order. If Plaintiff chooses to do so, she shall also file a redlined version of the proposed Amended

Complaint showing the revisions compared to her Complaint. Defendant will be permitted thirty (30) days after the filing of Plaintiff's motion for leave to amend to oppose it.

**CONCLUSION**

For the reasons stated herein, the Court grants in part and denies in part Defendant's Motion to Dismiss. Plaintiff's Section 349 and 350 claims concerning the Ginger Product shall proceed to discovery. Plaintiff's Section 349 and 350 claims concerning the Cinnamon Product are dismissed for lack of standing, Plaintiff's unjust enrichment claim is dismissed as duplicative, and Plaintiff's breach of express warranty claim is dismissed for failure to allege notice. Plaintiff has forty-five (45) days in which to seek leave to file a proposed Amended Complaint that cures the deficiencies identified herein with respect to her Cinnamon Product Section 349 and 350 claims.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 28, 2026
Brooklyn, New York